Maureen C. VanderMay, WSBA No. 16742
The VanderMay Law Firm PC
2021 S Jones Blvd.
Las Vegas, Nevada 89146
(702) 538-9300

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

ELF-MAN, LLC,

          Plaintiff,

v.

Charles Brown, an individual;
C. G. Chinque Albright, an
individual;
Andrew Lint, an individual
Ryan Hintz, an individual;
Jon Bauer, an individual;
Stephanie Housden, an individual;
Carlos Rodriguez, an individual;
Shannon Williams, an individual;
Candace Roberts, an individual;
Robert Luttrell, an individual;
Jessi Galloway, an individual;
Olga Symonenko, an individual;
Josephine Geroe, an individual;
Allen Athos, an individual;
Kurt Ogden, an individual;
Chrisann Ogden, an individual;
Amanda Simons, an individual;
Stephen Mize, an individual;
Dean Barnett, an individual; Brenda
Barnett, an individual; Charles
Solberg, an individual; Ryan
Lamberson, an individual; Melinda
Brommer, an individual; David Starr,
an individual; Rafael Torres, an
individual; Racheal Graham, an
individual; Jennifer Boyd, an

/ / / /

Case No.: 2:13-CV-00115-TOR

FIRST AMENDED COMPLAINT

COPYRIGHT INFRINGEMENT

DEMAND FOR JURY TRIAL

FIRST AMENDED COMPLAINT – Page 1

individual; William Brown, an          )
individual; DOE 2, DOE 5,              )
DOE 6, and DOE 24,                     )
                                       )
                    Defendants.        )
_____        )

Plaintiff Elf-Man, LLC, a limited liability company ("Elf-Man" / "Plaintiff"), pursuant to F.R.Civ.P. 15(a)(1)(A) hereby submits its first amended complaint and alleges as follows:

## INTRODUCTION

1.    Plaintiff Elf-Man produced a novel family oriented comedy motion picture regarding an Elf left by Santa to help a family come together and learn about Christmas.

2.    In the production of a motion picture there are countless expenses and labors, many of which are not evident in the final project.  Such expenses and labors include writers, staff persons, construction workers and others who are often union based employees working for a median salary.

3.    Indeed, the final product produced, which may be less than two hours long, is often sourced from hundreds of days and tens of thousands of hours of labor, followed by near countless hours of post-production until the final product is ready for viewing in a theater or at home.

4.    The end product that many consumers see is a few hours in a theater, or possibly a DVD product that once production is complete has a nominal cost on a per-viewing experience.  However, this is misleading to the true costs of the motion picture as the costs to view a completed motion picture or produce a single DVD are nominal compared to what is often years of work by thousands of people leading up to the end product.

5.    Added to this is that the only people publicly seen related to the end product, movie stars and those that are known to be affiliated with motion pictures, such as

FIRST AMENDED COMPLAINT – Page 2

directors and other persons of note, are all generally the highest compensated persons involved with the production of the work leading to the common misunderstanding that people involved in motion pictures are already wealthy.

6.     When the perception that those affiliated with a motion picture are already wealthy, and the end product, such as a DVD only costs very little to make, a reality disconnect often builds in the minds of much of the public, namely that those associated with a motion picture do not need any more money.

7.     When this reality disconnect meets with the ready availability of pirated copies of motion pictures and the ease at which they can be illegally copied and downloaded at an almost anonymous level, many people feel justified in their pirating or theft of motion pictures.

8.     The result is that despite the industry's efforts to capitalize on internet technology and reduce costs to end viewers through legitimate and legal means of online viewing such as through Netflix™, Hulu™, and Amazon Prime™, there are still those that use this technology to steal motion pictures and undermine the efforts of creators through their illegal copying and distribution of motion pictures.

9.     A common means of illegally copying and distributing content on the internet is through the use of a peer-to-peer network such as BitTorrent.

10.    In this case each of the Defendants has participated, either directly or indirectly or by facilitating the conduct of others, in illegally copying and distributing Plaintiff's motion picture via BitTorrent.

## JURISDICTION AND VENUE

11.    This is a suit for copyright infringement and contributory copyright infringement under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et seq. ("The Copyright Act").

/ / / /

FIRST AMENDED COMPLAINT – Page 3

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a).

## PARTIES

### THE PLAINTIFF

14.     Plaintiff Elf-Man, LLC is a limited liability company with principal offices in Frederick, Maryland, that produced the motion picture at issue in this matter.

### The Rights of the Plaintiff

15.     The motion picture in this case, titled *Elf-Man*, has been registered with the United States Copyright Office by the author, Elf-Man, LLC, Registration No. PA 1-823-286.

16.     The motion picture contains wholly original material that is copyrightable subject matter under the laws of the United States.

17.     The motion picture is currently offered for sale in commerce.

18.     Under the Copyright Act, Elf-Man, LLC is the proprietor of all right, title, and interest in the motion picture, including the right to sue for past infringement.

19.     Under the Copyright Act, Elf-Man, LLC also controls the exclusive rights to reproduce the motion picture and to distribute the motion picture to the public.

20.     Plaintiff's motion picture is easily discernible as a professional work as it was created using professional performers, directors, cinematographers, lighting technicians, set designers and editors and with professional-grade cameras, lighting and editing equipment.

/ / / /

/ / / /

/ / / /

FIRST AMENDED COMPLAINT – Page 4

21.    Defendants have notice of Plaintiff's rights through general publication and advertising and more specifically as identified in the content of the motion picture, advertising associated with the motion picture, and all packaging and copies, each of which bore a proper copyright notice.

## THE DEFENDANTS

### In General

22.    Defendants have each played at least one of the following roles in connection with the use of BitTorrent to unlawfully download Plaintiff's motion picture: 1) some or all Defendants are a group of BitTorrent users or peers whose computers are collectively interconnected and used for illegally copying and distributing Plaintiff's motion picture; 2) some or all Defendants contributed to the infringement of Plaintiff's copyrights by others; and 3) some or all Defendants permitted, facilitated and/or promoted the use of the internet access identified by their IP address for the infringing of Plaintiff's exclusive rights under The Copyright Act by others.

23.    Defendants and each of them have illegally and without authorization from Plaintiff copied, downloaded, shared and uploaded Plaintiff's motion picture using the BitTorrent system, and/or contributed to or permitted, facilitated or promoted such conduct by others.

24.    Defendants and each of them have been identified as directly, indirectly or contributorily infringing Plaintiff's copyrights in this district.

25.    Defendants have been identified in the instant case by a specific Internet Protocol or IP address and a "hash" (a file identifier generated by an algorithm developed and implemented by the National Security Agency).

26.    Under the BitTorrent protocol each file has a unique "hash" tied to a specific file.  In the instant case, all hashes identified on Exhibit 1 to Plaintiff's initial

FIRST AMENDED COMPLAINT – Page 5

1    complaint have been confirmed as being for an unauthorized copy of Plaintiff's

2    motion picture.

3    **Identification of the Named Defendants**

4    27.    Internet Service Provider ("ISP") Charter Communications, upon

5    information and belief, assigned Internet Protocol ("IP") address 71.92.105.212 to

6    Defendant Charles Brown for a period of time, including but not limited to

7    02/17/2013 at 03:18:48 a.m.

8    28.    At all times material, Defendant Charles Brown resided in Yakima,

9    Washington.

10    29.    Defendant Charles Brown's IP address of 71.92.105.212 was observed

11    infringing Plaintiff's motion picture at 03:18:48 a.m. on 02/17/2013.

12    30.    ISP Comcast Cable Holdings, Inc. ("Comcast"), upon information and belief,

13    assigned IP address 98.225.30.177 to C.G. Chinque Albright for a period of time,

14    including but not limited to 02/11/2013 at 10:53:31 a.m.

15    31.    At all times material, Defendant C. G. Chinque Albright resided in Spokane,

16    Washington.

17    32.    Defendant C. G. Chinque Albright's IP address of 98.225.30.177 was

18    observed infringing Plaintiff's motion picture at 10:53:31 a.m. on 02/11/2013.

19    33.    ISP Charter Communications, upon information and belief, assigned IP

20    address 68.119.15.168 to Andrew Lint for a period of time, including but not

21    limited to 01/15/2013 at 11:11:14 p.m.

22    34.    At all times material, Defendant Andrew Lint resided in West Richland,

23    Washington.

24    35.    Defendant Andrew Lint's IP address of 68.119.15.168 was observed

25    infringing Plaintiff's motion picture at 11:11:14 p.m. on 01/15/2013.

26    / / / /

27

28    FIRST AMENDED COMPLAINT – Page 6

36. ISP Charter Communications, upon information and belief, assigned IP address 68.119.15.128 to Defendant Ryan Hintz for a period of time, including but not limited to 04:34:16 p.m. on 12/20/2012.

37. At all times material, Defendant Ryan Hintz resided in West Richland, Washington.

38. Defendant Ryan Hintz's IP address of 68.119.15.128 was observed infringing Plaintiff's motion picture at 04:34:16 p.m. on 12/20/2012.

39. ISP LocalTel, upon information and belief, assigned IP address 199.36.95.71 to Jon Bauer and Stephanie Housden for a period of time, including but not limited to 12/19/2012 at 01:57:43 a.m.

40. At all times material, Defendants Jon Bauer and Stephanie Housden resided in Wenatchee, Washington.

41. Defendants Jon Bauer and Stephanie Housden's IP address of 199.36.95.71 was observed infringing Plaintiff's motion picture at 01:57:43 a.m. on 12/19/2012.

42. ISP Embarq Communications, upon information and belief, assigned IP address 67.237.227.124 to Carlos Rodriguez for a period of time, including but not limited to 12/15/2012 at 11:12:25 a.m.

43. At all times material, Defendant Carlos Rodriguez resided in Grandview, Washington.

44. Defendant Carlos Rodriguez's IP address of 67.237.227.124 was observed infringing plaintiff's motion picture at 11:12:25 a.m. on 12/15/2012.

45. ISP CenturyLink, upon information and belief, assigned IP address 71.37.130.169 to Shannon Williams for a period of time, including but not limited to 12/14/2012 at 06:33:22 p.m.

46. At all times material, Defendant Shannon Williams resided in Yakima, Washington.

FIRST AMENDED COMPLAINT – Page 7

47.    Defendant Shannon William's IP address of 71.37.130.169 was observed infringing Plaintiff's motion picture at 06:33:22 p.m. on 12/14/2012.

48.    ISP Comcast, upon information and belief, assigned IP address 67.185.38.85 to Candace Roberts for a period of time, including but not limited to 12/14/2012 at 07:21:29 a.m.

49.    At all times material, Defendant Candace Roberts resided in Spokane Washington.

50.    Defendant Candace Roberts' IP address of 67.185.38.85 was observed infringing Plaintiff's motion picture at 07:21:29 a.m. on 12/14/2012.

51.    ISP CenturyLink, upon information and belief, assigned IP address 174.31.83.171 to Robert Luttrell for a period of time, including but not limited to 12/12/2012 at 06:42:37 a.m.

52.    At all times material, Defendant Robert Luttrell resided in Spokane, Washington.

53.    Defendant Robert Luttrell's IP address of 174.31.83.171 was observed infringing Plaintiff's motion picture at 06:42:37 a.m. on 12/12/2012.

54.    ISP Comcast, upon information and belief, assigned IP address 24.16.113.58 to Jessi Galloway for a period of time, including but not limited to 12/11/2012 at 10:29:03 p.m.

55.    At all times material, Defendant Jessi Galloway resided in Spokane, Washington.

56.    Defendant Jessi Galloway's IP address of 24.16.113.58 was observed infringing Plaintiff's motion picture at 10:29:03 p.m. on 12/11/2012.

57.    ISP Comcast, upon information and belief, assigned IP address 67.185.235.226 to Olga Symonenko for a period of time, including but not limited to 12/11/2012 at 04:08:46 a.m.

FIRST AMENDED COMPLAINT – Page 8

58.    At all times material, Defendant Olga Symonenko resided in Spokane, Washington.

59.    Defendant Olga Symonenko's IP address of 67.185.235.226 was observed infringing Plaintiff's motion picture at 04:08:46 a.m. on 12/11/2012.

60.    ISP Comcast, upon information and belief, assigned IP address 174.61.161.244 to Josephine Geroe for a period of time, including but not limited to 12/10/2012 at 12:43:20 a.m.

61.    At all times material, Defendant Josephine Geroe resided in Spokane, Washington.

62.    Defendant Josephine Geroe's IP address of 174.61.161.244 was observed infringing Plaintiff's motion picture at 12:43:20 a.m. on 12/10/2012.

63.    ISP Comcast, upon information and belief, assigned IP address 76.28.216.226 to Allen Athos for a period of time, including but not limited to 12/07/2012 at 05:45:24 a.m.

64.    At all times material, Defendant Allen Athos resided in Spokane, Washington.

65.    Defendant Allen Athos' IP address of 76.28.216.226 was observed infringing Plaintiff's motion picture at 05:45:24 a.m. on 12/07/2012.

66.    ISP CenturyLink, upon information and belief, assigned IP address 67.5.94.32 to Defendants Kurt and Chrisann Ogden for a period of time, including but not limited to 12/07/2012 at 01:00:42 a.m.

67.    At all times material, Defendants Kurt and Chrisann Ogden resided in Deer Park, Washington.

68.    Defendants Kurt and Chrisann Ogden's IP address of 67.5.94.32 was observed infringing Plaintiff's motion picture at 01:00:42 a.m. on 12/07/2012.

/ / / /

FIRST AMENDED COMPLAINT – Page 9

69.    ISP Comcast, upon information and belief, assigned IP address 67.160.38.27 to Amanda Simons for a period of time, including but not limited to 12/07/2012 at 12:55:52 a.m.

70.    At all times material, Defendant Amanda Simons resided in Spokane, Washington.

71.    Defendant Amanda Simons' IP address of 67.160.38.27 was observed infringing Plaintiff's motion picture at 12:55:52 a.m. on 12/07/2012.

72.    ISP CenturyLink, upon information and belief, assigned IP address 71.37.135.90 to Stephen Mize for a period of time, including but not limited to 12/05/2012 at 03:21:11 a.m.

73.    At all times material, Defendant Stephen Mize resided in Spokane, Washington.

74.    Defendant Stephen Mize's IP address of 71.37.135.90 was observed infringing Plaintiff's motion picture at 03:21:11 a.m. on 12/07/2012.

75.    ISP Fairpoint, upon information and belief, assigned IP address 66.243.237.91 to Defendants Dean Barnett and Brenda Barnett for a period of time, including but not limited to 12/03/2012 at 11:36:42 p.m.

76.    At all times material, Defendants Dean Barnett and Brenda Barnett resided in Selah, Washington.

77.    Defendants Dean Barnett and Brenda Barnett's IP address of 66.243.237.91 was observed infringing Plaintiff's motion picture at 11:36:42 p.m. on 12/03/2012.

78.    ISP Comcast, upon information and belief, assigned IP address 67.185.155.193 to Charles Solberg for a period of time, including but not limited to 12/02/2012 at 11:57:39 p.m.

79.    At all times material, Defendant Charles Solberg resided in Liberty Lake, Washington.

FIRST AMENDED COMPLAINT – Page 10

80.    Defendant Charles Solberg's IP address of 67.185.155.193 was observed infringing Plaintiff's motion picture at 11:57:39 p.m. on 12/02/2012.

81.    ISP Comcast, upon information and belief, assigned IP address 24.16.123.206 to Defendant Ryan Lamberson for a period of time, including but not limited to 12/02/2012 at 04:39:20 p.m.

82.    At all times material, Defendant Ryan Lamberson resided in Spokane Valley, Washington.

83.    Defendant Ryan Lamberson's IP address of 24.16.123.206 was observed infringing Plaintiff's motion picture at 04:39:20 p.m. on 12/02/2012.

84.    ISP CenturyLink, upon information and belief, assigned IP address 97.115.138.248 to Defendant Melinda Brommer for a period of time, including but not limited to 12/02/2012 at 06:17:31 a.m..

85.    At all times material, Defendant Melinda Brommer resided in Nine Mile Falls, Washington.

86.    Defendant Melinda Brommer's IP address of 97.115.138.248 was observed infringing Plaintiff's motion picture at 06:17:31 a.m. on 12/02/2012.

87.    ISP Comcast, upon information and belief, assigned IP address 97.185.249.5 to Defendant David Starr for a period of time, including but not limited to 12/02/2012 at 01:36:58 a.m.

88.    At all times material, Defendant David Starr resided in Spokane, Washington.

89.    Defendant David Starr's IP address of 67.185.249.5 was observed infringing Plaintiff's motion picture at 01:36:58 a.m. on 12/02/2012.

90.    ISP Charter Communications, upon information and belief, assigned IP address 71.92.104.96 to Defendant Rafael Torres for a period of time, including but not limited to 12/02/2012 at 01:10:07 a.m.

FIRST AMENDED COMPLAINT – Page 11

91.    At all times material, Defendant Rafael Torres resided in Yakima, Washington.

92.    Defendant Rafael Torres' IP address of 71.92.104.96 was observed infringing Plaintiff's motion picture at 01:10:07 a.m. on 12/02/2012.

93.    ISP CenturyLink, upon information and belief, assigned IP address 97.115.143.158 to Defendant Racheal Graham for a period of time, including but not limited to 12/01/2012 at 06:03:50 p.m.

94.    At all times material, Defendant Racheal Graham resided in Spokane, Washington.

95.    Defendant Racheal Graham's IP address of 97.115.143.158 was observed infringing Plaintiff's motion picture at 06:03:50 p.m. on 12/01/2012.

96.    ISP Comcast, upon information and belief, assigned IP address 67.185.123.3 to Defendant Jennifer Boyd for a period of time, including but not limited to 12/01/2012 at 03:35:18 a.m.

97.    At all times material, Jennifer Boyd resided in Spokane, Washington.

98.    Defendant Jennifer Boyd's IP address of 67.185.123.3 was observed infringing Plaintiff's motion picture at 03:35:18 a.m. on 12/01/2012.

99.    ISP Comcast, upon information and belief, assigned IP address 24.16.115.15 to Defendant William Brown for a period of time, including but not limited to 12/01/2012 at 02:26:28 a.m.

100.   At all times material, Defendant William Brown resided in Spokane, Washington.

101.   Defendant William Brown's IP address of 24.16.115.15 was observed infringing Plaintiff's motion picture at 02:26:28 a.m. on 12/01/2012.

/ / / /

/ / / /

FIRST AMENDED COMPLAINT – Page 12

**Further Identification of the Remaining Doe Defendants**

102.   Plaintiff has not named in this amended complaint the persons identified as Does 2, 5, 6, and 24.  With respect to two of these Defendants, Plaintiff is still working with the ISP to obtain subscriber identifying information.  With respect to the other two Defendants, Plaintiff is working with the subscriber or his counsel in an effort to resolve this matter by way of settlement and has not named those parties to permit settlement discussions to continue, or should Defendant request, permit them to appear anonymously with leave of the Court. Plaintiff will either move to file a second amended complaint naming these Defendants or file notices of dismissals of the claims against them within the next 30 days.

## **JOINDER**

103.   Plaintiff acknowledges that joinder in this action under F.R.C.P. 20(a)(2) is permissive in that Plaintiff's claims arise out of the same occurrences or transactions, or series of occurrences or transactions and that there are questions of law and fact common to each of the Defendants.

104.   All of the Defendants have collectively acted through BitTorrent to illegally download and distribute Plaintiff's motion picture, or have contributed to and/or facilitated such conduct by others, each damaging Plaintiff.

105.   As such, Plaintiff's rights to relief, as stated below, ultimately arise out of the same series of transactions and occurrences.

106.   This action also raises substantial questions of law and fact common to all Defendants.

107.   Permissive joinder in the instant case is to permit a more efficient management of Plaintiff's claims against the several Defendants and to reduce the costs to Plaintiff and Defendants and to reduce the costs and burdens on the Court.
/ / / /

FIRST AMENDED COMPLAINT – Page 13

108.   Notice is provided, that on being specifically identified and on request from an identified Defendant, Plaintiff agrees to sever any Defendant that claims prejudice in being joined in this matter and to proceed against each such Defendant individually.

## FACTS COMMON TO ALL CLAIMS

### IP Addresses

109.   To connect to the internet and/or to provide such access to others, each Defendant was required to contract with an ISP and create an account for service. It is the ISP that grants each user access to the internet and the ability to send and receive information, whether in the form of an email, photo or motion picture.

110.   To identify the source and destination of any piece of information, an ISP assigns an IP address to each user which allows data to flow to and from each user of the internet.

111.   Each IP address is unique, and for any one time an IP address can be traced back to a specific ISP account holder and user.

112.   A standard term for any account for service from an ISP is that such service may not be used for illegal activity.  Indeed, many ISPs, such as Comcast, go to considerable lengths to advise their subscribers of their usage policies, including the prohibition of using or permitting use of the account to engage in infringing activity.

113.   Internet piracy and the use of the internet to conduct illegal activity are commonly known. As such both through the license granted to a user from their ISP to obtain an IP address and through common knowledge, Defendants were on notice of the need to limit the use of their IP address to legal and authorized activity.

/ / / /

FIRST AMENDED COMPLAINT – Page 14

**Peer-to-Peer Internet Piracy Via BitTorrent**

114.   As noted by Senator Levin in Congressional hearings on peer-to-peer internet piracy, "In the world of copyright law, taking someone's intellectual property is a serious offense, punishable by large fines. In the real world, violations of copyright law over the Internet are so widespread and easy to accomplish that many participants seem to consider it equivalent to jaywalking – illegal but no big deal. But it is a big deal. Under U.S. law, stealing intellectual property is just that – stealing. It hurts artists, the music industry, the movie industry, and others involved in creative work. And it is unfortunate that the software being used – called 'file sharing' as if it were simply enabling friends to share recipes, is helping create a generation of Americans who don't see the harm."

115.   Defendants, either directly or indirectly, utilized an interactive peer-to-peer file transfer technology protocol to copy Plaintiff's motion picture.

116.   Peer-to-peer networks, at least in their most common form, are computer systems that enable internet users to: 1) make files (including motion pictures) stored on each user's computer available for copying by other users or peers; 2) search for files stored on other users' computers; and 3) transfer exact copies of files from one computer to another via the internet.

117.   The particular peer-to-peer protocol at issue in this suit is the BitTorrent protocol.

118.   Defendants and each of them directly or indirectly used BitTorrent in a collective and often interdependent manner via the internet in the unlawful reproduction and distribution of Plaintiff's copyrighted motion picture.

119.   To use BitTorrent, a user intentionally downloads a small program that they install on their computers — the BitTorrent "client" application. The BitTorrent client is the user's interface during the downloading/uploading process.  The client may be

FIRST AMENDED COMPLAINT – Page 15

free, supported by advertising, offer upgrades or add on services for a fee, or a combination of several options.

120.   A BitTorrent client application typically lacks the ability to search for media or content files.  To find media or content available for download (as made available by other BitTorrent users), users intentionally visit a "torrent site" using a standard web browser.

121.   A torrent site is a website that contains an index of media or content being made available by other users (generally an extensive listing of movies and television programs, among other copyrighted content).  The torrent site hosts and distributes small files known as "torrent files." Torrent files do not contain actual media or content.  Torrent files are used to instruct a user's computer where to go and how to get the desired media or content.  Torrent files interact with specific trackers, allowing the user to download the desired media or content.

122.   A torrent site is often an advertisement-revenue based or subscription-supported index of media or content being made available by other users on the network and maintains a listing of movies and television programs among other copyrighted content.

123.   A user then uses the torrent site to connect with other users and exchange content though the BitTorrent protocol often with many users at the same time.

124.   Internet piracy, and in particular BitTorrent piracy, though known as peer-to-peer file sharing, is often a for-profit business as many software clients, torrent sites and networks generate millions of dollars in revenue through sales and advertising.

125.   Many participants, possibly including some or all of the Defendants, have paid money to facilitate or permit increased access to content which has been made available without authorization.

/ / / /

FIRST AMENDED COMPLAINT – Page 16

126.   The torrent file contains a unique hash identifier which is a unique identifier generated by a mathematical algorithm developed by the National Security Agency. This torrent file is tagged with the file's unique "hash," which acts as a "roadmap" to the IP addresses of other users who are sharing the media or content identified by the unique hash, as well as specifics about the media or content file.

127.   A BitTorrent tracker manages the distribution of files, connecting uploaders (those who are distributing content) with downloaders (those who are copying the content). A tracker directs a BitTorrent user's computer to other users who have a particular file, and then facilitates the download process from those users.  When a BitTorrent user seeks to download a motion picture or other content, he or she merely clicks on the appropriate torrent file on a torrent site, and the torrent file instructs the client software how to connect to a tracker that will identify where the file is available and begin downloading it.  In addition to a tracker, a user can manage file distribution through a Peer Exchange and/or a Distributed Hash Table.

128.   A Peer Exchange is a communications protocol built into almost every BitTorrent protocol which allows users to share files more quickly and efficiently. Peer Exchange is responsible for helping users find more users that share the same media or content.

129.   A Distributed Hash Table is a sort of world-wide telephone book, which uses each file's "hash" to locate sources for the requested media or content.  Thus, users are able to access a partial list of other users with the media or content they want rather than being filtered through a central computer called a tracker.  By allowing users to rely on individual computers for information, this not only reduces the load on the central tracker, but also means that every client that is sharing this media or content is also helping to hold this worldwide network together.

/ / / /

FIRST AMENDED COMPLAINT – Page 17

130.    Files downloaded in this method are downloaded in hundreds of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same file.  The effect of this technology makes every downloader also an uploader of the content.  This means that every user who has a copy of the infringing media or content on a torrent network is also a source for others to download that media or content.

131.    Thus, each IP address identified by the tracker is an uploading user who is running a BitTorrent client on his or her computer and who is offering the media or content for download. Once selected, the downloading user's BitTorrent client then begins downloading the media or content by communicating with the BitTorrent client programs running on one or more uploading users' computers.

132.    The effect of this distributed network of users all downloading and uploading the same file creates what is commonly known as a "swarm" wherein users operate collectively to copy and distribute media and content.

133.    Members of the swarm become interconnected to download files, wherein the download creates an exact digital copy on the downloaders' computers.  As additional infringers request the same file, each additional infringer joins the collective swarm, and each new infringer receives pieces of the file from each other infringer in the swarm who has already downloaded any part of the file.

134.    This distributed nature of BitTorrent leads to a rapid viral sharing of media and content throughout the collective peer users.  As more peers join the collective swarm, the frequency and speed of successful downloads also increases.

135.    Thus, a Defendant's distribution of even a single unlawful copy of the motion picture can result in the nearly instantaneous worldwide distribution of that single copy to an unlimited number of people.  In this case, each Defendant's copyright

/ / / /

FIRST AMENDED COMPLAINT – Page 18

1  infringement built upon the prior infringements, in a continuing cascade of
2  infringement going forward.

3  136.   Further, though it is clearly established that the Defendants, either directly or
4  indirectly, participated in the exact same swarm, possibly directly linking to each
5  other, the nature of the BitTorrent system is such that the exact same data may be in
6  multiple swarms at the same time. As such, while a single swarm more directly links
7  Defendants, the same data, Plaintiff's motion picture, is being transferred in many
8  swarms, making every identified Defendant a participant in, if not the same transaction
9  or occurrence, the same series of transactions or occurrences - the BitTorrent exchange
10  of Plaintiff's motion picture.

## Conduct of Defendants

11

12  137.   Plaintiff has recorded each IP address assigned to each Defendant identified
13  herein as actually copying and publishing Plaintiff's motion picture via BitTorrent, as
14  Plaintiff's investigator has downloaded the motion picture from each Defendant's IP
15  identified herein.

16  138.   This conduct was illegal and in violation of Defendants' license and terms of
17  access to the internet through their ISP.

18  139.    Each Defendant knew or should have known the infringing conduct observed
19  by Plaintiff was unlicenced and in violation of plaintiff's copyrights

20  140.   This case involves a single swarm in which numerous Defendants, either
21  directly or indirectly, engaged in mass copyright infringement of Plaintiff's motion
22  picture.

23  141.   Each Defendant's IP address was used to illegally upload and share Plaintiff's
24  motion picture within the swarm.

25  / / / /

26  / / / /

27

28   FIRST AMENDED COMPLAINT – Page 19

142.   Upon information and belief, each Defendant whose conduct constitutes direct infringement was a willing and knowing participant in the swarm at issue and engaged in such participation for the purpose of infringing Plaintiff's copyright.

143.   By participating in a swarm, each Defendant whose conduct constitutes direct infringement participated in the exact same or nearly identical transaction, occurrence, or series of transactions or occurrences as the other Defendants.

144.   Upon information and belief, many Defendants also acted in concert with others, including other Defendants by participating in a Peer Exchange.

145.   Upon information and belief, many Defendants also acted in concert with other Defendants and swarm members and by linking together globally through use of a Distributed Hash Table.

146.   Each Defendant's conduct is effectively a collective enterprise constituting substantially similar or identical facts.

**Exemplar Defendant**

147.   For example, IP address 98.225.30.177, which ISP Comcast has identified as having been assigned to  Defendant C.G. Chinque Albright at the time of the subject infringement, was used to initiate the infringing conduct alleged herein by first intentionally logging into one of the many BitTorrent client repositories known for their large index of copyrighted movies, television shows, software and adult videos. Said IP address was then used to intentionally obtain a torrent file identified by a "hash" or SHA1: 33E6C4D563C276F29A7A48502C6640191DE3DD72, in this specific instance which is for Plaintiff's motion picture from the index and intentionally loaded that torrent file into a computer program designed to read such files.

148.   With the torrent file intentionally loaded from said IP address, the user's BitTorrent program used the BitTorrent protocol to initiate connections with hundreds

FIRST AMENDED COMPLAINT – Page 20

of other users possessing and uploading or sharing copies of the digital media described in SHA1:33E6C4D563C276F29A7A48502C6640191DE3DD72, namely, Plaintiff's motion picture, including with, upon information and belief, other Defendants. As the motion picture was copied via said IP address piece by piece, these downloaded pieces of Plaintiff's motion picture were then immediately available to all other Defendants for those Defendants' uses from this direct infringer's computer.

149.   Each of Defendants' assigned IP addresses were used to perform the same acts as those described for Defendant Albright's, above. As a result, each of the direct infringers using these addresses also immediately became an uploader, meaning that each downloaded piece was immediately available to other users seeking to obtain the file without degradation in sound or picture quality. It is in this way that each IP address assigned to Defendants copied and distributed the motion picture at the same time. Thus, each participant in the BitTorrent swarm was an uploader or distributor and also a downloader or copier of Plaintiff's motion picture.

## CLAIMS FOR RELIEF STATED IN THE ALTERNATIVE

Pursuant to F.R.Civ.P. 8(d)(2), Plaintiff sets forth the following claims for relief in the alternative.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

150.   Plaintiff repeats and realleges each of the allegations above.

151.   Defendants have, without the permission or consent of Plaintiff, distributed Plaintiff's motion picture through a public website and any one of various public BitTorrent trackers, Peer Exchanges, and/or Distributed Hash Tables.

152.   Plaintiff alleges that each Defendant, without the permission or consent of Plaintiff, has used, and continues to use, BitTorrent software to download Plaintiff's

FIRST AMENDED COMPLAINT – Page 21

motion picture, to distribute the motion picture to the public, including hundreds of other BitTorrent users, and/or to make the motion picture available for distribution to others.

153.    Defendants' actions constitute infringement of Plaintiff's exclusive rights under The Copyright Act.

154.    Defendants' conduct has been willful, intentional, in disregard of and indifferent to Plaintiff's rights.

155.    As a direct and proximate result of Defendants' conduct, Plaintiff's exclusive rights under 17 U.S.C. § 106 have been violated.

156.    Plaintiff is entitled to damages pursuant to 17 U.S.C. § 504 and attorney fees and costs pursuant to 17 U.S.C. § 505.

157.    The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury.

158.    Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further contributing to the infringement of Plaintiff's copyrights and ordering that each Defendant destroy all copies of Plaintiff's motion picture made in violation of Plaintiff's rights.

## SECOND CLAIM FOR RELIEF
## CONTRIBUTORY INFRINGEMENT

159.    Plaintiff repeats and realleges each of the allegations 1 - 149 above.

160.    Defendants have, without the permission or consent of Plaintiff, contributed to the infringement of Plaintiff's copyrights by other Defendants and other swarm members.

161.    By participating in the BitTorrent swarm with other Defendants, each Defendant induced, caused or materially contributed to the infringement of Plaintiff's

/ / / /

FIRST AMENDED COMPLAINT – Page 22

exclusive rights under the Copyright Act by other Defendants and other swarm members.

162.   Defendants' conduct has been willful, intentional, in disregard of and indifferent to Plaintiff's rights.

163.   As a direct and proximate result of Defendants' conduct, Plaintiff's exclusive rights under 17 U.S.C. § 106 have been violated.

164.   Plaintiff is entitled to damages pursuant to 17 U.S.C. § 504 and attorney fees and costs pursuant to 17 U.S.C. § 505.

165.   The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury.

166.   Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further contributing to the infringement of Plaintiff's copyrights and ordering that each Defendant destroy all copies of Plaintiff's motion picture made in violation of Plaintiff's rights and take such further steps as are necessary to prevent further infringement.

## **THIRD CLAIM FOR RELIEF**

### **Alternative Statement Pursuant to FRCP 8(d)(2)**

### **Indirect Infringement of Copyright**

167.   Plaintiff repeats and realleges each of the allegations 1 - 149 above.

168.   Defendants obtained internet access through an ISP and permitted, facilitated and/or promoted the use of the internet access identified with the specific IP address for the infringing of Plaintiff's exclusive rights under The Copyright Act by others.

169.   Defendants, and each of them, are liable as indirect or secondary infringers.

170.   Defendants, and each of them, failed to secure, police and protect the use of their internet service against illegal conduct, including the downloading and sharing of Plaintiff's motion picture by others.

FIRST AMENDED COMPLAINT – Page 23

171.   Defendants' failure was with notice as illegal conduct is in violation of the law and in violation of the license for access granted to each Defendant by their ISP which issued them an IP address to access the internet.

172.   Defendants' conduct has been willful, intentional, in disregard of and indifferent to Plaintiff's rights.

173.   As a direct and proximate result of Defendants' conduct, Plaintiff's exclusive rights under 17 U.S.C. § 106 have been violated.

174.   Plaintiff is entitled to damages pursuant to 17 U.S.C. § 504 and attorney fees and costs pursuant to 17 U.S.C. § 505.

175.   The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury.

176.   Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further indirect infringement of Plaintiff's copyrights and ordering that each Defendant destroy all copies of Plaintiff's motion picture made in violation of Plaintiff's rights and take such further steps as are necessary to prevent further indirect infringement.

## DAMAGES

177.   Plaintiff has been damaged and claims damages of $30,000.00 from each Defendant on its First and Second Claims for Relief pursuant to 17 U.S.C. § 504(c)(1) and, in the alternative, damages on its Third Claim for Relief pursuant to 17 U.S.C. § 504(c)(1) of not more than the statutory minimum of $750.00.

### Notice of Further Claims

178.   While the relief prayed for by Plaintiff is specific and less than may be allowed by law, Plaintiff hereby provides notice of the potential damages available under various laws, such as 17 U.S.C. § 504, which include:

    a. Defendants' profits;

FIRST AMENDED COMPLAINT – Page 24

b. Plaintiff's full damages;

c. Statutory damages of up to $150,000.00 against each Defendant should there be a finding of willful conduct;

d. All costs and attorney fees incurred in this action; and

e. Broad equitable relief, including the destruction of all infringing articles and equipment used in the infringement.

179.   Plaintiff gives notice it may move for permission to amend its complaint so as to elect the full scope of relief available against each or any Defendant as discovery proceeds.

180.   Similarly, as discovery proceeds Plaintiff may move to amend its complaint to name additional direct infringers of its copyrighted work.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

A.  On all Claims for Relief:

1.  For entry of permanent injunctions enjoining each Defendant from directly, contributorily or indirectly infringing Plaintiff's rights in Plaintiff's motion picture, including without limitation by using the internet to reproduce or copy Plaintiff's motion picture, to distribute Plaintiff's motion picture, or to make Plaintiff's motion picture available for distribution to the public, except pursuant to a lawful license or with the express authority of Plaintiff, and further directing Defendants to destroy all unauthorized copies of Plaintiff's motion picture and for such other;

2.  Plaintiff's reasonable costs and attorney fees pursuant to 17 U.S.C. § 505; and

3.  Any further relief as the Court deems proper;

/ / / /

FIRST AMENDED COMPLAINT – Page 25

B. On its First and Second Claims for Relief Only, for $30,000.00 damages pursuant to 17 U.S.C. § 504;

C. On its Third Claim for Relief Only, for  statutory damages of not more than $750.00 pursuant to 17 U.S.C. § 504 should Defendant be found liable solely for non-willful infringement under Plaintiff's alternate theory.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

DATED: August 30, 2013

Respectfully submitted,

The VanderMay Law Firm

s/ Maureen C. VanderMay
Maureen C. VanderMay, WSBA No. 16742
email: elfmanwa@vandermaylawfirm.com
The VanderMay Law Firm
2085 Commercial Street NE
Salem, OR 97301
(503) 588-8053
Of Attorneys for Plaintiff

AMENDED COMPLAINT – Page 26